## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**STEPHEN LUCAS**                      **CIVIL ACTION**

**VERSUS**                             **NO. 24-1943**

**CITY OF THIBODAUX, ET AL.**          **SECTION "O"**

## ORDER AND REASONS

Before the Court in this now-federalized dispute among neighbors is a Rule 12(b)(6) motion[1] to dismiss for failure to state a claim by Defendants Lafourche Parish Sheriff Craig Webre and Lafourche Parish Sheriff's Office Deputies Lafate Day,[2] Zachary Sciortino, and Stephen Waldrop (collectively, the "LPSO Defendants"). Plaintiff Stephen Lucas opposes[3] the motion, and the LPSO Defendants filed a reply.[4] For the following reasons, the LPSO Defendants' motion to dismiss is **GRANTED**.

## I.   BACKGROUND

This 42 U.S.C. § 1983 civil rights lawsuit is the latest installment in a decadelong feud among Stephen Lucas and Jeremy Landry, neighbors in the Sugar Ridge West Estates Subdivision in Thibodaux, Louisiana. To hear Lucas tell it—as the Court must at this stage of the litigation—Lucas has been persistently victimized by Landry's aggressive conduct. Landry's alleged harassment campaign against Lucas started in early 2016 after Lucas, who alleges he simply wanted to improve the neighborhood drainage system, brought to light that Landry and his contracting

---

[1] ECF No. 20.
[2] Deputy Lafate Day was incorrectly named as Elliot Day in the Complaint. *See id.*
[3] ECF No. 21.
[4] ECF No. 25.

company lost the public bid to perform the subdivision's drainage work; work that Lucas says was necessitated by Landry's company's poor workmanship in initially installing the drainage system when Sugar Ridge West Estates was first developed.

Since the drainage project was finished by a different contractor in early 2016, Lucas says Landry has retaliated, that Landry would repeatedly drive past Lucas's house, rev his engine, screech the breaks, and violate traffic laws by speeding and disregarding stop signs; on occasion, Landry nearly hit Lucas with his vehicle and, other times, Landry keyed or otherwise damaged Lucas's (and Mrs. Lucas's) cars. When Lucas attempted to confront him, Landry attacked and pistol-whipped Lucas, leading to Landry's arrest. But Landry was "undercharged" with second degree battery. When Lucas obtained a protective order, Landry reciprocated, obtaining a protective order allegedly in retaliation based on misrepresentations about Lucas.

Still Landry persisted. Landry continued to harass Lucas, tailgated him, even following Lucas to the grocery store only to key Lucas's car while he shopped. Another time, when Lucas was returning from grocery shopping, Landry threw a sizable rock at Lucas's car, shattering the windshield. Another time, Landry followed Mrs. Lucas and keyed her car while she was inside a restaurant.

Lucas often called the police—either the LPSO or Thibodeaux Police Department ("TPD")—to report these incidents. Sometimes a warning or a citation issued to Landry. For some incidents, Lucas requested that criminal charges be filed against Landry, but Lucas felt that the police "avoided charging" Landry.

Fed up, Lucas now seeks a federal forum to redress his grievances against his neighbor, Landry, as well as the City of Thibodaux and local law enforcement officers from TPD and LPSO.[5] Lucas's federal complaint consists of a narrative recitation of facts, organized by "incidents," followed by a series of legal claims (including four federal claims under 42 U.S.C. § 1983 and five state law claims against various defendants). At this, the pleadings, stage, the Court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to" Lucas. *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016) (internal quotation marks omitted). What follows is a summary of the alleged facts contextualizing the instant motion to dismiss.

### The Neighbors and the Genesis of their Neighborhood Feud

Lucas is an Army veteran.[6] Landry is a contractor who owns his own company, LA Contracting Enterprise, L.L.C.[7] Landry is "also a reserve deputy at Assumption Parish Sheriff's Office."[8]

Lucas (and his wife) and Landry (and his wife and family) live ".1 miles apart" on Sugarfield Drive in the Sugar Ridge West Estates Subdivision in Thibodaux, located in Lafourche Parish.[9] As Lucas sees it, the genesis of the neighbors' feud began in late 2015 when Lucas "brought to light" that a "reputable" contracting

---

[5] Lucas sues Landry as "a natural person"; the City of Thibodaux; and names specific law enforcement officers from TPD and LPSO, some sued in their individual capacities, others in their official capacities, and others in both their individual and official capacities.

[6] ECF No. 1 ¶ 2. Mrs. Lucas is "employed in the parish government." *Id.* ¶ 3.

[7] *Id.* ¶¶ 7-8, 10.

[8] *Id.* ¶¶ 15, 175.

[9] *Id.* ¶¶ 4, 23. Lucas and his wife purchased their house on June 6, 2013. *Id.*

company—not Landry's—won the public bid for their Subdivision's drainage project; a project that was necessary allegedly due to Landry's company's "fail[ure] to properly . . . install drainage during the [Subdivision's] development[.]"[10] Landry, "holding on to a perceived slight," then allegedly "coordinated a pattern of a series of intentional actions of harassment, physical harm, often involving law enforcement as well as the legal process to harm Stephen Lucas, spanning over the past decade."[11]

When the Subdivision's drainage project was completed, around February 2016, Lucas alleges that Landry "began to repeatedly pass in front of the Lucas Residence specifically at times when Mr. Lucas [was] outside [and Landry] would intentionally and repeatedly revved-up (sic) his vehicle's engine, screech the brakes, and sped through the stop-sign at the intersection of Meadow View Court and Sugarfield Drive."[12] Lucas seeks relief for "Landry's ongoing behavior" which has allegedly "escalated in addition to becoming more aggressive and hostile against Mr. Lucas."[13]

Lucas recounts, incident-by-incident (pages 8 through 52 of his Complaint), interactions with Landry, law enforcement responses, and protective-order proceedings in state court. First, the background incidents (pages 8-33 of the Complaint). Lucas alleges that the inaugural—May 7, 2016—incident unfolded as follows: while driving, Landry "purposefully swerved" and "nearly hit" Lucas, who

---

[10] *Id.* ¶¶ 5-12.

[11] *Id.* ¶ 12.

[12] *Id.* ¶ 25. Of the three routes in which Landry may enter or exit the Subdivision to reach or leave his own house at the end of the cul-de-sac, one requires traveling past Lucas's house. *Id.* ¶ 24.

[13] *Id.* ¶ 26.

4

called LPSO; Lucas then went to Landry's house "to calmly discuss their differences."[14] When Landry did not answer Lucas's knock on the door, Lucas was "walking away when he was viciously attacked by Defendant Landry who was armed with a pistol."[15] Lucas alleges that, as a result of being "pistol-whipped," he suffered four broken bones and was later "granted a protective order." But Lucas nevertheless was miffed that Landry was "undercharged with 14:34.1 Second Degree Battery" and that the LPSO report of the incident failed to note that Landry "was armed with a pistol, refused to relinquish his pistol, [and was] intoxicated[.]"[16] Lucas also alleges that Landry "retaliated" against him by "fil[ing] a false Protective Order alleging that Mr. Lucas tried to break into his residence," and that Landry made false statements to a local reporter who published a piece about the alleged break-in.[17]

In a second (May 11, 2016) incident, Lucas alleges that Landry violated the protective order by "deliberately" driving in front of Lucas's house while he was cutting grass, and that LPSO's report failed to acknowledge that Landry had two alternative routes to drive in which he could avoid driving by Lucas's house.[18] Incident three (July 26, 2016), which Lucas reported to LPSO, involved Lucas's allegations that Landry "aggressively followed and then tailgated [and] attempt[ed] to run Lucas off the road, then later . . . [Lucas's] vehicle was keyed" while he was getting groceries and Landry "spit[] on Lucas['s] driveway."[19]

---

[14] *Id.* ¶¶ 27-28.
[15] *Id.* ¶ 29.
[16] *Id.* ¶ 30-32, 137.
[17] *Id.* ¶¶ 32-34.
[18] *Id.* ¶¶ 35-37.
[19] *Id.* ¶¶ 38-39, 41.

In yet another incident, on August 8, 2016, Lucas alleges that Landry "followed him and staked out . . . Lucas[,] waiting for him to return from Rouses [and then Landry] threw a sizable rock at Mr. Lucas' face from a moving vehicle, which resulted in shattering his Jeep windshield."[20] Lucas filed a complaint with the Thibodeaux Police Department ("TPD"), which interviewed Landry.[21] After Mrs. Lucas met with TPD and was told that no charges were pursued because there was no "video evidence," Landry allegedly followed Mrs. Lucas and keyed her car.[22] TPD responded to the complaint for this incident six on November 15, 2016.[23] On December 13, 2016, Lucas alleges that the Louisiana Attorney General suddenly and without notice "dropped the criminal charges against Defendant Landry."[24]

Several months later on May 24, 2017, Lucas alleges that Landry—while driving by Lucas's house where Lucas was outside mowing the lawn—spontaneously "confessed" to Lucas that he (Landry) had: lied to law enforcement, "retaliate[ed]" against Lucas "every time [Lucas] flipped [Landry] off," damaged the Lucas's cars, and stated that he (Landry) would pay $300 for the Jeep damage and $900 for the damage to Mrs. Lucas's car.[25]

Lucas alleges several other perceived transgressions (not labeled "incidents"): (i) Lucas called LPSO "in reference to [Landry's] black Porche vehicle speeding down

---

[20] *Id.* ¶ 42.
[21] *Id.* ¶¶ 43-44.
[22] *Id.* ¶¶ 45-46.
[23] *Id.* ¶ 47. In the meantime, Lucas alleges that Landry harassed Lucas on November 11 and "bragged about keying Mrs. Lucas' car." *Id.* ¶ 49. Mrs. Lucas reported Landry's alleged confession to TPD seven years later on November 20, 2023. *Id.*
[24] *Id.* ¶ 50.
[25] *Id.* ¶ 51.

the street" but LPSO declined to act because LPSO did not observe the alleged traffic violation; (ii) the "unconcerned" response of law enforcement when presented with Landry's recorded "confession"; (iii) Landry allegedly filed a false report with LPSO "after approaching Mr. Lucas while he walked back from a neighbor's residence[, after which] Landry lied about the entire encounter[, then LPSO failed to note] that Defendant Landry had his door ajar and pistol in his hand."[26]

Lucas next alleges that Landry victimized him twice in January 2019. First, on January 9, 2019, Lucas alleges that "Landry drove a four-wheeler into the backyard of the Lucas Residence with a pistol in his lap, while Mr. Lucas was cutting grass[]," and then Landry returned, stopped in front of Lucas's house, and "became angry and pulled a pistol on Mr. Lucas" when Lucas ignored him.[27] When LPSO responded to Lucas's complaint, deputies reviewed Lucas's surveillance video and then contacted Landry to advise that Landry would be issued a warning for the traffic violation, disregarding a stop sign.[28] In a second January 2019 incident, Lucas alleges that Landry "again trespasse[d]" on his property while driving a four-wheeler, acted aggressively, and "tore up the Lucas' servitude in a fit of rage."[29] Lucas alleges that his complaint to LPSO "led to Mr. Landry being cited for reckless operation of an off road vehicle" but that Landry was not cited for trespassing due to the property markers undermining support for such a claim.[30] "In retaliation" for Lucas's report,

---

[26] *Id.* ¶¶ 53-.58.
[27] *Id.* ¶¶ 59-60.
[28] *Id.* ¶¶ 61-62.
[29] *Id.* ¶ 63.
[30] *Id.* ¶ 64.

Landry and his wife allegedly "filed a false police report . . . that Mr. Lucas nearly caused [Mrs. Landry] to wreck when he pulled out in front of her on his lawn mower."[31]

Lucas alleges that Landry continued to harass him. For example, Landry allegedly approached Lucas on July 29, 2020 while Lucas was cutting grass and yelled at him, attempting to "bait [him] into a fight in the public street."[32] Two months later, Landry allegedly followed Lucas to the grocery store, where Lucas "witnessed Defendant Landry keyed his vehicle in the Rouses parking lot."[33] Lucas reported the incident to TPD, which interviewed Landry.[34] The day after this alleged car-keying incident, Lucas alleges that his name and address "were posted to neighborhood Facebook page encouraging the community to give him a hard time and harass him indiscriminately."[35]

By this time, Lucas alleges, "there had been approximately seventy-one (71) documented incidents of harassment and intentional actions by Defendant Landry" which allegedly culminated on September 26, 2020 "in Mr. Lucas shooting a firearm into the ground of the Lucas Residence when a drunken mob led by Defendant Landry approached Mr. Lucas threatening him and his wife."[36] Lucas alleges that LPSO

---

[31] *Id.* ¶ 65.
[32] *Id.* ¶ 67. According to Lucas, the LPSO report indicates that Lucas requested that Landry be criminally charged.
[33] *Id.* ¶¶ 69-70.
[34] *Id.*
[35] *Id.* ¶ 73.
[36] *Id.* ¶¶ 74-75.

"overcharged Mr. Lucas with aggravated assault with a firearm."[37] Lucas alleges that the Landrys then obtained a protective order based on Landry's false testimony.[38]

The "drunken mob incident" which Lucas alleges provoked him to shoot his firearm into the floor of his own home did not end the feud. Rather, Lucas alleges that Landry "was increasingly and repeatedly showing up at the Lucas Residence . . . to bait Mr. Lucas into a violent confrontation" and Lucas believes Landry was armed with a pistol when he did so.[39] On April 30, 2021, Lucas alleges that Landry filed a false police report with LPSO in which "Landry instigated a scenario screaming from the street . . . that Mr. Lucas and his wife were not welcomed here[;]" when LPSO interviewed Landry, he indicated he "would like to make a report to try to get the protective order reinstated."[40] And, Lucas alleges, Landry "filed another protective order on the same day based on these false allegations."[41]

For nearly one year, Lucas does not allege any incidents in the feud with Landry. But then on March 25, 2022, while both he and Landry were driving their respective vehicles, Lucas alleges that Landry "purposely got in front of Mr. Lucas, then stopped short to try to cause him to rear end him," but that the TPD did not follow up "[b]ecause the video [taken by Lucas on his phone] did not show the incident that caused Mr. Lucas's reaction because [the camera] was faced toward Mr. Lucas[.]"[42]

---

[37] *Id.* ¶ 76.
[38] *Id.* ¶¶ 77-80.
[39] *Id.* ¶¶ 81-83.
[40] *Id.* ¶¶ 81-83.
[41] *Id.* ¶ 85.
[42] *Id.* ¶¶ 86-88.

On January 7, 2023, Lucas alleges that, while he and his wife were walking on the roadway in the subdivision, Landry stalked them, drove behind them, and then "drove past them at a high rate of speed [almost] hitting Mr. Lucas when he passed them."[43] Though Lucas alleges that LPSO advised the Lucases that Landry did not violate any laws in passing them as they walked on the roadway, and that Landry's speed could not be determined, Lucas claims that LPSO declined to investigate Landry for stalking and that when the Lucases met with Lafourche Parish Sheriff Webre, he "did not care" about the Lucases and "would not even admit that stalking is a crime" in Louisiana.[44]

Another alleged near-miss incident occurred on February 24, 2023. That day, Lucas was walking on his street when Landry, driving his white truck, "made a hand gesture toward [Lucas] slapping his face," then almost hit Lucas with his truck before Landry sped out of the subdivision.[45] LPSO was advised of the incident but "would not consider any further action."[46] A few weeks later on March 10, 2023, Landry "passed seven times in five minutes honking, gesturing, yelling at Mr. Lucas while he was fertilizing the front yard[.]"[47] LPSO told Mrs. Lucas it would document the incident.[48] When Landry found out that the Lucases called LPSO, Landry allegedly

---

[43] *Id.* ¶ 89.
[44] *Id.* ¶¶ 90-91.
[45] *Id.* ¶ 92.
[46] *Id.* ¶¶ 93-94.
[47] *Id.* ¶ 95.
[48] *Id.* ¶¶ 96-97. The LPSO Report indicates that Mrs. Lucas discussed the drainage project as the impetus for Landry's alleged harassment of Lucas. *Id.*

"retaliate[ed]" by making a false report to LPSO that it was Lucas who yelled obscenities and flipped him off as he was driving by the Lucas's house.[49]

*The "Current Allegations"*

Next up, the "current allegations" or incidents forming the basis of the claims alleged in the instant lawsuit (pages 34-52 of the Complaint). Lucas alleges that—since September 26, 2020—Landry "would concoct a legal issue to further place Mr. Lucas in the legal system."[50] On August 4, 2023, when Lucas appeared in court for the pretrial conference related to the September 26, 2020 incident, Landry showed up and "shoulder checked" Lucas's friend in the courthouse stairwell, twice screamed "suck my d—ck", and "taunt[ed]" Lucas and his friends by saying "we'll see ya."[51] While Lucas and his friends waited at LPSO to report this incident against Landry, Landry also showed up at LPSO—except, it was not LPSO officers, but TPD Officer John Lirette who "responded" and TPD Officer Prejean who "took over the narrative in a clearly biased manner."[52] TPD proceeded to "investigate" by interviewing first the Lucas group and then Landry, but (Lucas alleges) Landry "proceeded to continue his false narrative" with Officer Prejean allegedly acquiescing, notwithstanding alleged video footage undermining Landry's narrative.[53] Ultimately, Lucas alleges that the outcome of his complaint regarding Landry's courthouse conduct coupled with Landry's false statements (which TPD acquiesced in its allegedly biased

---

[49] *Id.* ¶¶ 98-99.
[50] *Id.* ¶ 114.
[51] *Id.* ¶¶ 115-17.
[52] *Id.* ¶¶ 118-24.
[53] *Id.* ¶¶ 124-30.

investigation) was that Lucas and his friends were charged with disturbing the peace—without justification—whereas Landry was not charged.[54]

Three days after the courthouse stairwell incident—on August 7, 2023— Landry filed in state court against Lucas a petition seeking a protective order, allegedly replete with "patently false and misleading allegations against Mr. Lucas."[55] During the hearing on the petition for the protective order, Lucas alleges that Landry testified that he was and is a "commissioned [police] officer" and, further, that Landry committed perjury in recounting the courthouse stairwell incident as well as the May 7, 2016 and September 26, 2020 incidents.[56] Landry's protective order "[c]ase was dismissed with prejudice in favor of Mr. Lucas."[57]

*Alleged LPSO Misconduct Predicating Lucas's Claims*

Two months later in October 2023, Lucas alleges that Mrs. Landry made a false complaint to LPSO that Lucas—several days earlier—had "held up his middle finger" to her juvenile daughters driving home from school.[58] LPSO Lieutenant Gabe Leblanc drafted the narrative for the LPSO Report #J-14030-23 documenting Mrs.

---

[54] *Id.* ¶¶ 131-41. Lucas alleges that the charge was baseless because he never even spoke to Landry at the courthouse. *Id.* ¶ 140. The disturbing the peace charges were eventually dropped. *Id.*

[55] *Id.* ¶¶ 148-57.

[56] *Id.* ¶¶ 158-61. Before and after this allegation that Landry is a commissioned officer, Lucas alleges that Landry is a reserve deputy in the Assumption Parish Sheriff's Office. *Id.* ¶¶ 15, 175. In the motion to dismiss, Defendants argue that any allegation by Plaintiff that Landry is a "reserve deputy" with Assumption Parish Sheriff's Office is insufficient standing alone to render his bystander liability claim plausible. ECF No. 20-1 at 16. Lucas repeats this allegation regarding Landry's "reserve" status with Assumption Parish in his opposition to the motion to dismiss. ECF No. 21 at 12.

[57] ECF No. 1 ¶ 163.

[58] *Id.* ¶¶ 164-65. This October 9, 2023 incident is one which Lucas argues involves the LPSO Defendants. *See* ECF No. 21 at 12.

Landry's allegations on behalf of her daughters regarding Lucas allegedly standing in his yard while gesturing to them with his middle finger. [59]

On November 30, 2023, Landry disregarded traffic signs while driving his black truck, sped around the corner from his house, stopped at the Lucas's house, "jumped out of the running truck," and crossed into the Lucas's driveway, where he "proceeded to scream death threats at Mr. and Mrs. Lucas[.]"[60] LPSO Deputy Stephen Waldrop appeared on scene before the Lucases called authorities.[61] Lucas alleges that the LPSO report of the incident (which nowhere suggests that a loaded firearm was retrieved from Landry's truck) conflicts in several respects with the dashboard camera footage (which shows that Officer Waldrop retrieved Landry's pistol from a neighbor, who had cleared and retrieved the pistol from Landry's unlocked truck during the incident).[62] Landry, who claimed that the incident was his reaction to his minor daughter's allegation that Lucas had tail-gated her and tried to run her off the road—allegations which Lucas claims are refuted by video recordings collected from Lucas and other neighbors—was briefly handcuffed but ultimately not cited or charged for the November 30 incident.[63]

---

[59] ECF No. 1 ¶ 165.

[60] *Id.* ¶ 167.

[61] *Id.* ¶ 168. Lucas alleges that Waldrop spoke to Major Elliot (Lafate) Day who was also enroute, having been called by Landry, and who advised Waldrop of the history between Landry and Lucas. *Id.* ¶ 169.

[62] *Id.* ¶¶ 131-41. According to Lucas, the dash cam footage also captured the following, which was not reflected in the LPSO report: Landry "resisting Defendant Stephen Waldrop and Deputy Sergi Savoie"; Waldrop and Savoie took Landry to his house, not to the precinct; three unnamed officers from Assumption Parish Sheriff's Office arrived at Landry's residence; Waldrop told Landry that he "put people at risk" speeding and running stop signs; discussion among Waldrop, Sciortino, and Day in which the officers "villainiz[e] Lucas" while justifying Landry's actions. *Id.* ¶¶ 174-79.

[63] *Id.* ¶¶ 179-82.

The next day, December 1, 2023, Mrs. Lucas filed a petition against Landry seeking a protective order, which was consolidated with the one Mrs. Landry had filed on her behalf and on behalf of her children against Lucas; the court issued mutual protective orders.[64]

*The Instant Lawsuit*

This civil rights lawsuit followed on August 5, 2024. Lucas asserts nine causes of action and names nine defendants: Jeremy Landry as "a natural person," the City of Thibodeaux, as well as various law enforcement personnel in the Thibodaux Police Department (Bryan Zeringue, in his individual and official capacity as Chief of the TPD; Beau Prejean, in his official capacity as detective in the TPD; John Lirette, in his official capacity as an officer in the TPD), as well as law enforcement personnel of the Lafourche Parish Sheriff's Office (Craig Webre, in his individual and official capacity as the Sheriff of LPSO; Lafate Day,[65] in his official capacity as an officer of the LPSO; Stephen Waldrop, in his official capacity as an officer of the LPSO; and Zachary Sciortino, in his individual and official capacity as an officer of the LPSO).

In Counts 1 and 2, Lucas alleges that Defendants Prejean, Lirette, the TPD, and the City of Thibodaux violated his First Amendment and Fourth Amendment rights under 42 U.S.C. § 1983. Pertinent to the instant motion, Lucas alleges in Count 3 that certain LPSO Defendants (Waldrop, Sciortino, Day, and the LPSO) failed to intervene "when Defendant Landry was violating Mr. Lucas' constitutional rights" in

---

[64] *Id.* ¶¶ 184-85. Lucas alleges that the Landry's daughter ultimately testified that she did not see clearly whether Lucas ever flipped her off. *Id.* ¶ 186.

[65] LPSO Defendants contend that Deputy Lafate Day was incorrectly named as Elliot Day in the Complaint. ECF No. 20 at 1.

violation of Lucas's Fourth Amendment rights under § 1983. In Count 4, Lucas asserts a *Monell* claim against Lafourche Parish Sheriff Webre (as well as Police Chief Zeringue and the Thibodaux Police Department, LPSO, and City of Thibodaux). In Counts 5, 6, and 9, Lucas alleges various state-law claims against Landry, including defamation, abuse of process, and malicious prosecution (related to the civil orders of protection). Finally, as to "all defendants," Lucas alleges in Counts 7 and 8 state-law claims for abuse of right and intentional infliction of emotional distress.

The City of Thibodaux and Chief Zeringue, along with officers Prejean and Lirette, filed an answer.[66] As did Landry.[67] The LPSO Defendants now move to dismiss Lucas's claims against them for failure to state a claim, citing a litany of grounds: Lucas's claims are prescribed; Lucas fails to state a plausible bystander liability claim; Lucas fails to allege any constitutional violation being perpetrated by a fellow officer which the LPSO Defendants should have intervened to protect against; Lucas, a private citizen, has no judicially cognizable interest in the prosecution (or non-prosecution) of another; the LPSO Defendants are entitled to qualified immunity for those claims advanced against them in their individual capacities; Lucas's *Monell* claim against Sheriff Webre is insufficiently pled; and Lucas fails to plead any state-law claim against the LPSO Defendants and/or the LPSO deputy defendants are entitled to Louisiana's discretionary immunity statute for law enforcement officers.

---

[66] ECF No. 13.
[67] ECF No. 14.

## II.    LEGAL STANDARDS

### A. Procedural:  Rule 12(b)(1) and (6)

"Rule 12(b)(1) motions challenge the subject matter jurisdiction of the district court." *McLin v. Twenty-First Jud. Dist.*, 79 F.4th 411, 415 (5th Cir. 2023). "[A] claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (citation omitted) (quotation omitted). Courts are to consider a Rule 12(b)(1) jurisdictional argument before addressing any other arguments on the merits. *Id.* (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). Even in the absence of a Rule 12(b)(1) motion, *sua sponte* dismissal is mandatory when the Court determines that it lacks subject-matter jurisdiction. *See Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021) (citations omitted).

When a defendant brings a Rule 12(b)(1) motion, or when jurisdiction is examined *sua sponte*, "the plaintiff bears the burden of proof in establishing that jurisdiction does in fact exist." *See Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 481 (5th Cir. 2024). To carry his burden at the pleading stage, the plaintiff generally must "allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012). Where the jurisdictional question is confined to the pleadings, the Rule 12(b)(6) standard applies: "[a]ll well-pleaded facts are accepted as true and viewed in the light most favorable to the

plaintiff." *Shemwell v. City of McKinney*, 63 F.4th 480, 483 (5th Cir. 2023) (internal quotations and citations omitted).

Under Rule 12(b)(6), a complaint that does not meet Rule 8(a)(2)'s pleading standard should be dismissed for failing to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Ultimately, "[t]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although courts "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal

conclusions are not accepted as true.'" *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023) (cleaned up).

These same pleading standards apply to civil rights claims like Lucas's. Specific applications of the ordinary pleading standards to civil rights lawsuits are relevant here. For example, resort to group pleading—faulting defendants "as a group without factual material suggesting that any particular defendant" violated the plaintiff's civil rights—is insufficient to state a plausible claim against a particular individual defendant. *See Armstrong v. Ashley*, 60 F.4th 262, 274-75 (5th Cir. 2023). This is so because "a § 1983 plaintiff 'must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* at 275. Furthermore, "'a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity.'" *See Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (citation omitted); *see also Santander v. Salazar*, 133 F.4th 471, 478 (5th Cir. 2025) (citations omitted).

**B. Substance: Federal Civil Rights, 42 U.S.C. § 1983**

Enacted pursuant to Congress's authority to enforce the Fourteenth Amendment, 42 U.S.C. § 1983 "provides a cause of action against state actors who violate an individual's rights under federal law." *Filarski v. Delia*, 566 U.S. 377, 380 (2012). It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983.

To establish § 1983 liability, the plaintiff must satisfy three elements: "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted); *see also Loera v. Kingsville Ind. Sch. Dist.*, 151 F.4th 813, 818 (5th Cir. 2025) (citations omitted) (combining latter two elements, articulating two elements: a violation of a right secured by federal law and that "the alleged deprivation was committed by a person acting under color of state law"). Satisfaction of the first element implements the principle that "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Victoria W.*, 369 F.3d at 482 (citations omitted). And, "[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (citation omitted); *see also Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005) (modified citation) ("Mere private conduct, no matter how discriminatory or wrongful, is excluded from § 1983's reach.").

*Capacities and Immunities*

A § 1983 plaintiff may pursue remedies against state actors in their official or individual capacities. As to the LPSO Defendants, Lucas purports to sue Sheriff Webre and Deputy Sciortino in both their individual and official capacities, whereas he purports to sue Deputies Day and Waldrop solely in their official capacities.

"The performance of official duties creates two potential liabilities, individual-capacity liability for the person and official-capacity liability for the municipality." *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 484 (5th Cir. 2000). The substantive law distinguishes between federal civil rights claims pursued against an official in his *official* capacity and those against an official in his *individual* (or personal) capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (explaining the doctrinal and practical differences between the two capacities).

Official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)). Because the entity is the real party in interest, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official," liability is premised upon "the entity's 'policy or custom' [which] must have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citation omitted).

20

Thus, a person may sue a municipality that violates his or her constitutional rights "under color of any statute, ordinance, regulation, custom, or usage." *See Monell*, 436 U.S. at 690. A plaintiff pursuing a municipal *Monell* liability claim must show "the deprivation of a federally protected right caused by action taken pursuant to an official municipal policy." *Hutcheson v. Dallas Cnty., Texas*, 994 F.3d 477, 482 (5th Cir. 2021) (citation omitted). Specifically, "[a] plaintiff must identify '(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom).'" *Id.* (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (cleaned up)). Critically, "[m]unicipalities are not liable 'on the theory of *respondeat superior*' and are 'almost never liable for an isolated unconstitutional act on the part of an employee.'" *Id.* (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)).

In contrast, "[p]ersonal-capacity suits seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer*, 502 U.S. at 25 (citation omitted). Thus, "[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.* (plaintiff pursuing individual capacity claim need not establish a connection to governmental "policy or custom"). Another distinction of consequence: "officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as

objectively reasonable reliance on existing law." *Id.* (citation omitted); *see also Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) (citation omitted).

Qualified or "good faith" immunity is available for officials sued in their individual capacities for executory or investigatory functions. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 807-08 (1982) (citations omitted); *accord Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (citation omitted). Because such immunity is an immunity from suit, not merely a defense to liability, "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (denial of qualified immunity is immediately appealable; a defendant's entitlement to qualified immunity should be determined at the earliest possible stage of the litigation).

Assertion of qualified immunity "adds a wrinkle to § 1983 pleadings." *Arnold v. Williams*, 979 F.3d 262, 266-67, 269 (5th Cir. 2020) ("Ordinarily, after determining that a plaintiff had plausibly alleged constitutional violations, we would turn to the qualified-immunity analysis."). Unlike the actor claiming absolute immunity (who bears the burden of establishing he enjoys absolute immunity), when a defendant invokes a qualified immunity defense in a motion to dismiss, "[t]he plaintiff [bears] the burden of demonstrating that qualified immunity is inappropriate." *Green v. Thomas*, 129 F.4th 877, 883 (5th Cir. 2025) (citation omitted). In the face of a qualified

immunity defense, "the plaintiff must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm alleged and that defeat a qualified immunity defense with equal specificity." *Nevarez v. Dorris*, 135 F.4th 269, 274 (5th Cir. 2025) (citation omitted). Accordingly, "[t]o defeat a qualified immunity defense, the plaintiff must [allege facts which] show '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Id.* With respect to the second prong, which encompasses the objective reasonableness of the defendant-official's conduct, "[a] [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The reasonableness of the official's conduct and the degree to which the particular right in question was clearly established are thus merged into one issue for purposes of the qualified immunity analysis." *Ramirez v. Guadarrama*, 3 F.4th 129, 133-34 (5th Cir. 2021) (*per curiam*). The reviewing court may tackle these questions in whatever order it deems expeditious. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## III.   ANALYSIS

The LPSO Defendants move to dismiss each of Lucas's claims asserted against them. The parties' contentions frame the Court's resolution of the motion, which the Court finds should be granted.

### A. Plaintiff's Concessions Narrow the Scope of Contested Issues.

The LPSO Defendants (Sheriff Craig Webre, Lafate Day, Zachary Sciortino, and Stephen Waldrop) move to dismiss all claims alleged against them asserting various grounds: (1) the LPSO is not a proper party; (2) any claims predicated on conduct occurring prior to August 4, 2023 are prescribed; (3) Plaintiff fails to plead a failure to intervene claim; (4) Plaintiff has no legally cognizable interest in Landry's arrest or prosecution; (5) Defendants are entitled to qualified immunity for individual capacity claims; (6) Plaintiff fails to plead a plausible *Monell* claim; (7) Plaintiff fails to plead plausible state law claims for abuse of right and intentional infliction of emotional distress and Defendants are immune from such liability.[68]

For his part, Lucas clarifies that "the basis for . . . claim[s against the LPSO Defendants] starts on paragraph 114 [of the Complaint;]" in particular, Lucas argues that his claims against the LPSO Defendants "involve the incidents on October 9, 2023 and November 30, 2023."[69] Contending that "all other incidents highlight the pattern of violations of Mr. Lucas' civil liberties[,]"[70] Lucas thus concedes ground (2), *i.e.,* that any claims predicated on conduct occurring before August 4, 2023 are time-barred or prescribed. As for ground (1), Lucas contends that LPSO is not listed as a party and thus dismissal is not warranted.[71] As for (3), Lucas contends that he pled a plausible bystander liability claim insofar as the LPSO Defendants "were well aware that . . . Landry utilized his reserve credentials to contact three unnamed

---

[68] ECF No. 20-1 at 14- 27.
[69] ECF No. 21 at 2, 12.
[70] *Id.*
[71] *Id.* at 11.

officers from Assumption Parish Sheriff's Office to be present [after the November 30, 2023 incident]" but that, regardless, bystander liability is not reserved for police officers and the fact that Lucas has sued Landry solely for state law tort claims has no bearing on whether the LPSO Defendants may be liable for failure to intervene in Landry's "excessive force."[72]

Addressing ground (4), Lucas contends that he "certainly has not pled that recovery is based upon Lafourche Deputies' failure to arrest or charge Landry, but rather in their disregard of the Equal Protection Clause."[73] Lucas then responds to grounds (5) and (6) by: suggesting that "Defendants have conceded that the causes of actions against Defendants were sufficiently alleged under its official capacities"; asserting that Lucas has alleged that the LPSO Defendants made misrepresentations in police reports in violation of state law; and citing to a local media report purportedly quoting Sheriff Webre's December 2020 comments on intervention training for deputies as well as a White Paper published by Georgetown Law School ostensibly in support of the bystander liability and/or *Monell* claims.[74] Finally, as to (7), Lucas contends that his allegations that the LPSO Defendants "assisted Landry"

---

[72] *Id.* at 12-18. Lucas also argues—in a fashion that is at best inconsistent with the allegations in his complaint, where he names Landry as a defendant in his private civilian capacity only and nowhere alleges facts indicating that Landry acted as a state officer in harassing Lucas, just that he happened to be a commissioned officer with a different sheriff's office—that "the Complaint alleges that his constitution (sic) rights have (sic) violated by Defendant Landry when he entered on to the Lucas' Residence in a rage of fit (sic) threatening death with a loaded gun at the console ready, detaining Mr. Lucas[]" when Landry knew that Lucas could not have a firearm due to the October 12, 2020 protective order issued against Lucas. *Id.* at 17.

[73] *Id.* at 18-19.

[74] *Id.* at 19-22. Lucas suggests that he has alleged all elements of a *Monell* claim, particularly given his history with Landry: "by this time, Mr. Lucas rarely contacted [LPSO] or [TPD] due to the double standards and repeated decisions of failing to charge Defendant Landry."

suffice to allege causes of action against them for Landry's alleged abuse of rights and intentional infliction of emotional distress.[75]

In reply, the LPSO Defendants first contend that Lucas's bystander liability theory fails as a matter of law because the Complaint contains no factual allegations plausibly indicating that Landry acted under color of state law in his conduct targeting Lucas such that Lucas has not alleged facts supporting element one of bystander liability, *i.e.,* that any of the LPSO officers knew that a *fellow officer acting under color of state law* was violating an individual's constitutional rights.[76] Second, they contend that Lucas's reliance on state public records laws to suggest that his claims are predicated on a "falsified police report" makes no sense/is implausible where Lucas asserts no claim that he was subject to false arrest or malicious prosecution but, rather, instead his claims stem from his dissatisfaction that Landry was not arrested or charged for his conduct victimizing Lucas.[77] Third and finally, the LPSO Defendants contend that Lucas cannot advance an Equal Protection claim when such a claim is nowhere alleged in his Complaint and, even if it is, Lucas still fails to allege that he is a member of a protected class or how he has been treated differently.[78]

Considering that Lucas concedes that the LPSO is not a proper party and that any cause of action predicated on conduct occurring before August 2023 would be

---

[75] *Id.* at 23-24. In addition to citing the elements of intentional infliction of emotional distress claims, Lucas also sets forth the duty-risk analysis that he contends would be applicable to a claim for negligent infliction of emotional distress though no such claim appears in his Complaint.

[76] ECF No. 25 at 1-4.

[77] *Id.* at 4.

[78] *Id.* at 5.

time-barred, this obviates Court resolution or analysis of these issues. Accordingly, (i) LPSO is not a proper juridical party and insofar as Plaintiff named the LPSO as a separate entity, any claims against LPSO as a standalone entity will be dismissed; and (ii) insofar as any claims against the LPSO Defendants are based on conduct or incidents occurring prior to August 2023, such claims are time-barred and therefore dismissed.[79]

Having conceded the lion's share of factual allegations are time-barred, Lucas features two incidents—October 9 and November 30, 2023—as the predicates to Section 1983 liability for the LPSO Defendants. But, like Lucas and the defendants, the Court focuses on the second of those two, considering that the first appears to involve an LPSO officer that is not named as a defendant in this proceeding. Moreover, it is unclear how the first incident could predicate Section 1983 (or any) liability for any LPSO Defendant.[80] And Lucas does not attempt to explain it.[81]

Additionally, because Lucas's official capacity claims advanced against Sciortino, Day, and Waldrop are merely redundant of the official capacity claim

---

[79] Section 1983 does not provide a limitations period. So courts borrow from state law: "[t]he statute of limitations for a suit brought under § 1983 is determined by the general statute of limitations governing personal injuries in the forum state." *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001) (citation omitted). In Louisiana, before July 1, 2024, that period is one-year. *See* La. Civ. Code art. 3492, *repealed on July 1, 2024 and replaced by* La. Civ. Code art. 3493.1. Effective July 1, 2024, Louisiana's statute of limitations for personal injury claims changed from one to two years. La. Civ. Code art. 3493.1.

[80] Lucas alleges that, in October 2023, Mrs. Landry made a false complaint to LPSO that Lucas—several days earlier—had "held up his middle finger" to her juvenile daughters driving home from school. ECF No. 1 ¶¶ 164-65. LPSO Lieutenant Gabe Leblanc drafted the narrative for the LPSO Report #J-14030-23 documenting Mrs. Landry's allegations on behalf of her daughters. *Id.* ¶ 165. The plaintiff does not mention Leblanc anywhere else in the complaint, nor does the plaintiff explain why Leblanc was not named as a defendant, or how drafting the narrative of a report made to the LPSO by Landry's wife renders an LPSO officer or sheriff liable to Lucas.

[81] *See* ECF No. 21 at 12.

against Sheriff Webre (and because Lucas fails to allege that any LPSO officer or deputy had any policymaking authority), the official capacity claims against Sciortino, Day, and Waldrop must be dismissed. *See Garza v. Escobar*, 972 F.3d 721, 734 (5th Cir. 2020) (citation omitted).

As addressed below, the Court agrees with the LPSO Defendants that Lucas's claims against them must be dismissed for several overlapping and independent reasons: Lucas lacks standing to challenge their failure to investigate or arrest Landry; Lucas fails to allege any plausible Section 1983 claim against the LPSO Defendants in their individual or official capacities because he fails to allege a constitutional violation by an official clothed with state authority; and Lucas fails to allege facts supporting either state law claim advanced against them.

### A. Standing: Lucas, the Victim, Lacks Article III Standing to Sue Officials for Failure to Investigate His Perpetrator, Landry.

Because it implicates the Court's subject matter jurisdiction, the Court first takes up the LPSO Defendants' contention that Lucas's Section 1983 claims are subject to dismissal because, as a private citizen, Lucas lacks a cognizable interest in the prosecution or non-prosecution of another private citizen, Landry. The Court agrees; any claim predicated on the theory that the LPSO Defendants inadequately investigated or failed to investigate, charge, or prosecute Landry must be dismissed without prejudice for lack of standing.

Federal courts are courts of limited jurisdiction. Accordingly, courts are duty-bound to examine the basis of subject matter jurisdiction *sua sponte. Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008) (citation omitted); *see also Nat'l*

*Football League Players Ass'n v. Nat'l Football League*, 874 F.3d 222, 225 (5th Cir. 2017) (The Court must "examine [its] own subject-matter jurisdiction 'whenever [it] appears fairly in doubt.'"). Subject matter jurisdiction can never be waived or forfeited, *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012), "and the district court 'shall dismiss the action' whenever 'it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter.'" *Avitts v. Amoco Prod. Co.*, 53 F.3d 690, 693 (5th Cir. 1995) (quoting Fed. R. Civ. P. 12(h)(3)).

As for constitutional limits on federal jurisdiction, Article III of the Constitution extends "[t]he judicial Power," only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[I]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted).

The justiciability doctrine of standing implements this constitutional limit on federal jurisdiction and ensures fidelity to separation of powers and the prohibition against rendering advisory opinions on abstract disputes. For example, "a case or controversy can exist only if a plaintiff has standing to sue." *United States v. Texas*, 599 U.S. 670, 675 (2023). "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) (citation omitted). To establish standing to sue, "a plaintiff must demonstrate (i) that []he has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would

be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citations omitted). "[S]tanding is not dispensed in gross" so "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC*, 594 U.S. at 431).

Though not framed by the LPSO Defendants as a feature of subject matter jurisdiction, the case law invoked for this dismissal ground confirms that a crime victim has no Article III standing to sue a government official for failure to investigate or for inadequate investigation of his perpetrator. *See Lefebure v. D'Aquilla*, 15 F.4th 650, 655, 654 (5th Cir. 2021) (citation omitted) (holding "it is not the province of the judiciary to dictate prosecutorial or investigative decisions to [an] executive branch"); *see also Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 278 (2010) (Roberts, C.J., dissenting from dismissal of writ of certiorari as improvidently granted) ("Our entire criminal justice system is premised on the notion that a criminal prosecution pits the government against the governed, not one private citizen against another."). This is simply a specific application of the standing doctrine: a complaint must concern a plaintiff's own treatment, not the treatment of others. *See Lefebure*, 15 F.4th at 654, 658 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973) and noting that "longstanding Supreme Court precedent confirms that a crime victim lacks standing to sue . . . for failing to investigate . . . her perpetrator, due to lack of causation and redressability").

Here, Lucas seeks to hold the LPSO Defendants accountable for injuries he allegedly suffered as a result of harassment perpetrated by his neighbor, Landry, the singular alleged assailant. As Lucas tells it in his Complaint, there is one victim and one perpetrator in the decadelong conflict between neighbors. Jeremy Landry—"a person within the neighborhood, and a contractor, whose company failed to properly . . . install the drainage during the development of Sugar Ridge West Estates Subdivision"—persistently harassed, assaulted, and victimized Lucas in a variety of forms (threats, intimidation, filing frivolous protective orders, violated traffic laws and intimidated Lucas with his car). Per Lucas, Landry was motivated by Lucas "bringing . . . to light" that Landry's contracting business had lost the public bid in favor of a "reputable company" to correct the earlier work poorly performed by Landry and his company.

It is *not* alleged that any of the LPSO Defendants independently perpetrated any harassment, intimidation, property damage, or traffic violations against Lucas. Nor are there allegations that the LPSO Defendants conspired with Landry in carrying out Landry's revenge or acted in furtherance of Landry's personal vendetta against Lucas. Instead, Lucas's allegations concerning the LPSO Defendants are derivative of his allegations against his alleged neighbor-nemesis, Landry. That is, Lucas challenges the LPSO's failure to investigate (or investigative shortcomings) or its failure to charge (or undercharging) Landry despite Lucas's numerous claims of victimization. But Lucas lacks standing to sue on this basis: no cognizable claim

exists against law enforcement officers on grounds that the plaintiff is dissatisfied with law enforcement's investigation into his putative rival.

Lucas resists this characterization of his grievances. But it is drawn directly from his own allegations. Lucas's complaint is replete with references to responding police officers' failures to charge Landry, or Lucas's desire that Landry be charged for the alleged harm Lucas suffered at Landry's hands:

- ECF No. 1 ¶ 31 (alleging that Landry was "undercharged");

- ¶ 39 (alleging that Lucas indicated he would contact TPD if he obtained video surveillance "to pursue charges" against Landry for keying Lucas's car);

- ¶ 50 (referencing that on December 13, 2016 the Attorney General "suddenly dropped the criminal charges against Defendant Landry without victim notification and against wishes of [the] Assistant Attorney General"; and further referencing that Lucas "followed up" with the AG's office five times);

- ¶ 68 (referencing LPSO case narrative from July 29, 2020 incident reflecting that "Mr. Lucas has requested criminal charges be filed against Mr. Landry for disturbing the peace and for harassment for this incident [and] Mr. Lucas has also requested that criminal charges be filed against Mr. Landry for all the past reported incidents to the Sheriff's Office to include criminal trespassing since the statute of limitations has not expired yet");

- ¶ 72 (alleging that the TPD "failed to obtain video [from Rouses parking lot] in order to avoid charging Defendant Landry" for September 24, 2020 incident);

- ¶ 74 (alleging that by September 25, 2020 when Landry posted Lucas's name and address to the neighborhood Facebook page encouraging the neighbors to harass Lucas, "Mr. Lucas rarely contacted [LPSO] or [TPD] due to the double standards and repeated decisions of failing to charge Defendant Landry");

- ¶ 76 (alleging that LPSO "overcharged Mr. Lucas" and failed to report that Lucas first called 911 that night and that LPSO "did not attempt to get a statement, did not question Defendant Landry");

- ¶ 90 (alleging that the narrative for the LPSO case report reflected that Lucas was "advised . . . that Mr. Landry's speed could not be determined to pursue

any type of charges [which upset the Lucases who] eventually understood why no charges were pursued");

- ¶ 91 (alleging that Lucas was informed that LPSO "higher-ups would not allow [LPSO] to seek out additional videos, and request for stalking investigation [was] denied");

- ¶¶ 92-94 (alleging that LPSO "would not consider any further action" against Landry after Lucas reported on February 24, 2023 that Landry nearly hit Lucas with his vehicle);

- ¶¶ 131-47 (alleging that Lucas was cited for disturbing the peace but, due to a biased investigation by TPD, Landry was not charged);

- ¶¶ 169-73 (alleging that the LPSO report failed to reflect what the dashboard camera videos show, which was that Landry "resisted" Defendant Waldrop; and "to avoid charging Landry for these threats of harm and his actions against Mr. Lucas" LPSO failed to include in its report that Landry had a loaded firearm in his truck);

- ¶ 177 (alleging that police officers were "actively trying to find ways to charge Mr. Lucas without investigation and evidence, despite witnessing Defendant Landry's actions firsthand");

- ¶¶ 178-79 (alleging that the police officers "seem well aware of Defendant Landry's violent tendencies" but that they "attempted to justify Defendant Landry's actions" and "at least two of the deputies hav[e] an on-going personal relationship with Defendant Landry, with no interest in having an unbiased investigation" such that "[u]ltimately, . . . Defendant Stephen Waldrop decided not to issue any citations on Defendant Landry");

- ¶¶180-81 (alleging that video evidence corroborates that Lucas was victimized by Landry and refutes Landry's allegations that Lucas victimized Landry's daughter);

- ¶ 213 (alleging that "[n]ot only was (sic) Defendants deliberately indifferent to Defendant Landry's attacks on Mr. Lucas, they were biased in their investigations and follow through, repeatedly excusing [Landry's] violent behavior and actions committed . . . against Plaintiff").

Simply put, Lucas alleges LPSO officers fell short in their investigation of

Landry's repeated harassment of Lucas. Insofar as Lucas seeks to recover from the

LPSO Defendants due to their failure to investigate or charge Landry, such claims are simply not cognizable because "victims do not have standing based on whether other people—including their perpetrators—are investigated or prosecuted." *Lefebure*, 15 F.4th at 652 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617-19 (1973)). "[T]hough a crime victim has certainly been injured by the criminal, that injury is usually neither traceable to executive-branch inaction nor redressable by a judgment against an executive branch official." *Cano v. Garcia*, No. 21-50742, 2022 WL 1548671, at *1-2 (5th Cir. May 16, 2022) (unpublished) (quoting *Lefebure*, 15 F.4th at 654 and citing *Linda R.S.*, 410 U.S. at 618). Lucas thus has no constitutional right to have the LPSO Defendants investigate, charge, or prosecute Landry. Accordingly, Lucas fails to allege facts indicating that the LPSO Defendants' nonenforcement (or inadequate enforcement) of state criminal (or traffic) laws caused Lucas harm redressable by the LPSO Defendants.

In the face of this clear application of well-established law to the facts alleged in his Complaint, Lucas pivots and attempts to recast his cause of action, arguing that he "has not pled that recovery is based upon Lafourche Deputies' failure to arrest or charge Landry, but rather in their disregard of the Equal Protection Clause."[82] But Lucas nowhere alleges an Equal Protection claim in his complaint, either in form or substance.[83] Regardless, this repackaging attempt fails to save his doomed claims

---

[82] ECF No. 21 at 18.

[83] Even indulging (as Plaintiff suggests) that "a plaintiff could allege" an equal protection claim based on a defendant's intentional discrimination against the plaintiff based on the plaintiff's membership in a protected class or based on a facially neutral policy that has adverse effects and was motivated by discriminatory animus, ECF No. 21 at 18, Plaintiff does not allege facts supportive of an equal protection theory here. So, too, could a plaintiff attempt to allege a class of one equal protection

34

predicated on the LPSO Defendants' failure to investigate, charge, or prosecute Landry. *See, e.g., Pratt v. Helms*, 73 F.4th 592, 595 (8th Cir. 2023) (citations omitted) (agreeing with the Fifth Circuit's disposition in *Lefebure* and expressly finding that "a victim has no constitutional right to an investigation of a crime against him—at least where, as here, the victim brings a class-of-one equal-protection claim").

Moreover, even indulging Lucas's assertion that he intended to frame his § 1983 cause of action against the LPSO Defendants as anchored to the Equal Protection Clause, a crime victim's failure-to-investigate claim is a standing problem, not a pleading problem that could be remedied by amendment. *See Lefebure v. Boeker*, No. 17-1791, 2023 WL 3069125, at *2-3 (M.D. La. Mar. 31, 2023) (Jackson, J.) (citing *Lefebure*, 15 F.4th at 662) (concluding that the Fifth Circuit's reasoning applies to prosecutors and law enforcement with equal force and denying leave to amend as futile, reasoning that the plaintiff's contention that the sheriff's discriminatory failure to investigate led to her injury fails for lack of standing*), appeal dismissed sub nom. Lefebure v. Daniel*, No. 23-30260, 2023 WL 7180621 (5th Cir. June 9, 2023).

Furthermore, in the very opposition papers in which Lucas purports to repackage his cause of action under the Equal Protection clause, Lucas continues to frame his grievance against the LPSO Defendants as a failure to investigate Landry. Just like the Complaint, Lucas in his opposition features the LPSO Defendants' alleged failure to accurately report and investigate, and failure to arrest, Landry for

---

violation or a failure to protect theory if warranted by alleged facts, but Lucas does not press facts supporting such theories here. And principles of forfeiture and party presentation prevent the Court from advancing substantive arguments on behalf of parties. The Court thus declines to address facts and theories neither alleged nor briefed.

his conduct on November 30, 2023.[84] For example, Lucas contends in his opposition that the dashboard camera videos "depicted a gross departure of the written LPSO Report" in several ways, including in the report's failure to mention what the video shows: "Defendant Landry resisting Defendant Stephen Waldrop and Deputy Sergi Savoie[.]"[85] Lucas argues that the LPSO Defendants "intentionally hid this information [that a loaded firearm was in Landry's vehicle on November 30, 2023] *in order to avoid charging Defendant Landry* for these threats of harm and his actions against Mr. Lucas."[86] Lucas also contends that the dash camera shows that "Defendant Stephen Waldrop and Deputy Sergi Savoie bring Defendant Landry to his residence, *and not to the precinct*[.]"[87] Additionally, Lucas takes issue with the LPSO report failing to "mention . . . three unnamed officers from Assumption Parish Sheriff's Office, where Defendant Landry is a reserve Deputy[.]"[88]

Lucas argues that the LPSO Defendants were aware of Defendant Landry's allegedly violent disposition and the LPSO Defendants had "no interest in having an unbiased investigation."[89] Again, Lucas is focused on the LPSO Defendants' decision "not to issue any citations to Defendant Landry."[90] In sum, the thrust of Lucas's grievance with the LPSO Defendants is their alleged "acquiesce[nce] in the alleged

---

[84] In his opposition papers, Lucas expressly concedes that most of his allegations are time-barred and therefore contends that "the basis for [the] claims" predicating his lawsuit "start[ ] on paragraph 114" and the allegations "pertaining to the Lafourche Parish Sheriff's Office involve the incidents on October 9, 2023 and November 30, 2023." ECF No. 21, p. 2.

[85] ECF No. 21 at 3 (citing ECF No. 1 ¶¶ 170-71).

[86] *Id.* at 5 (citing ECF No. 1, ¶ 172) (emphasis added).

[87] *Id.* (citing ECF No. 1 ¶ 174) (emphasis added).

[88] *Id.* (citing ECF No. 1 at ¶ 175).

[89] *Id.* at 7, 6 ("Defendant Stephen Waldrop, Defendant Zachary Sciortino, and Defendant Major Elliot Day seem well aware of Defendant Landry's violent tendencies.").

[90] *Id.* at 7.

constitutional violation by failing to report the matter accurately by not conducting an unbiased investigation, failing to name all parties present, failing to report the gun, by failing to preserve the evidence on (sic) which the gun was loaded and placed on the console of his truck."[91]

Insofar as Lucas's claims against the LPSO Defendants rest on Lucas's disappointment or unmet expectations concerning investigatory and charging shortcomings, dismissal without prejudice for lack of standing is compelled by binding precedent. No matter how frustrated and outraged Lucas has become over Landry's allegedly incessant harassment, Lucas lacks standing to sue the LPSO Defendants for their failure to investigate or charge Landry. *See Lefebure*, 15 F.4th at 651-52 (describing allegations as "sickening" and observing "[i]f anyone deserves to have her day in court, it is Priscilla Lefebure," but nonetheless reversing and remanding with instructions to dismiss the complaint for lack of subject matter jurisdiction as to the prosecutor); *see also Lefebure*, No. 17-1791, 2023 WL 3069125, at *1-2 (granting sheriff's motion for judgment on the pleadings dismissing without prejudice for lack of standing plaintiff's "horrifying" claims that an assistant warden at a state penitentiary repeatedly raped the plaintiff, and that the district attorney and sheriff conspired to ensure that the assailant would not be prosecuted for his crimes).

In addition to dismissal of Lucas's Section 1983 claims against the LPSO Defendants in their individual capacities, insofar as Lucas's *Monell* claim against

---

[91] *Id.* at 19 (citing ECF No. 1 ¶¶ 164-82).

Sheriff Webre in his official capacity is predicated on this failure to investigate or charge theory/narrative, the same result obtains. *Cf. Piotrowski v. City of Houston*, 237 F.3d 567, 572-73, 584-85 (5th Cir. 2001) (holding that "[a] city cannot be liable to a member of the public for failing to prosecute a known wrongdoer if no individual City employee could be liable for the same neglect").[92] Insofar as Lucas in his Complaint casts himself as the victim of a singular alleged assailant, Landry, and claims that the LPSO failed to investigate Landry's victimization of Lucas, any such claim is nonjusticiable, for "a victim has no constitutional right to an investigation of a crime committed against him[.]" *Pratt v. Helms*, 73 F.4th 592, 595 (8th Cir. 2023). Accordingly, any Section 1983 claim against the LPSO Defendants predicated on their failure to investigate (or inadequate investigation of) Landry must be dismissed without prejudice.

As set forth below, Lucas's Section 1983 claims against the LPSO Defendants fail for other independent reasons. Lucas fails to allege facts indicating that any LPSO Defendant engaged in conduct that violated Lucas's constitutional rights. And by alleging facts indicating that Landry was *not* acting under the pretense of official authority in his capacity as an Assumption Parish reserve deputy but, instead, as a private citizen pursuing a personal vendetta against his neighbor, Lucas fails to allege any facts that would support the essential elements of a Section 1983 claim

---

[92] In *Piotrowski*, "what makes this domestic dispute especially unusual is that [the plaintiff's ex-boyfriend, Richard Minns] used the services of at least two members of the [Houston Police Department] as well as one member of the Houston Fire Department to harass Piotrowski." Nevertheless, the city was not liable under Section 1983 for alleged constitutional violations arising from its failure to prevent the plaintiff's boyfriend from trying to kill her. *Id.*

against the LPSO Defendants: a constitutional deprivation or violation perpetrated by a person acting under-color-of-state-law. These interrelated defects likewise doom Lucas's *Monell* claim against Sheriff Webre.

> **B.**    **Section 1983's Essential Elements: Lucas Fails to Allege Facts Plausibly Indicating that Landry Acted Under Color of State Law and Lucas Fails to Allege Any Constitutional Violation Perpetrated by the LPSO Defendants.**

The Court next takes up the LPSO Defendants' contention that Lucas's Section 1983-based claims against them must be dismissed because Lucas has failed to allege the requisite elements of a Section 1983 claim: constitutional violation under color of state law.[93] Specifically, the LPSO Defendants contend that Lucas fails to allege against them a plausible Section 1983 claim predicated on a Fourth Amendment bystander liability theory because Lucas fails to allege facts indicating that Landry was acting under color of state law in harassing Lucas or using "excessive force" against Lucas such that none of the LPSO Defendants plausibly could have stood by while a *fellow officer* was violating Lucas's constitutional rights.

The Court agrees. To state a claim under § 1983, Lucas must—yet he fails to—allege both a constitutional deprivation and that "the alleged deprivation was committed by a person acting under color of state law." *See Loera v. Kingsville Ind. Sch. Dist.*, 151 F.4th 813, 818 (5th Cir. 2025) (citations omitted).

Context is critical to framing this dismissal ground. Lucas does not allege that any LPSO Defendant directly violated or deprived him of his constitutional rights;

---

[93] ECF No. 20-1 at 16-17; ECF No. 25 at 1-4.

rather, his Section 1983 theory is that the LPSO Defendants stood by in disregard of a duty to intervene while *Landry* harassed Lucas and used "excessive force" against Lucas in violation of the Fourth Amendment. But Lucas fails to allege any *constitutional* injury. Notably absent from Lucas's Complaint are: (i) any factual allegations plausibly indicating that Landry was acting under color of state law when he allegedly harassed and/or assaulted Lucas; (ii) any factual allegations supporting any claim for a federal constitutional violation against Landry; (iii) any factual allegations or legal causes of action against the LPSO Defendants for constitutional violations independent of Landry's alleged harassment or "excessive force" against Lucas.

Lucas fails to allege facts permitting the Court to plausibly infer that Landry acted under color of state law in harassing Lucas. It follows that Lucas has not alleged a constitutional violation by the LPSO Defendants. Furthermore, absent an alleged constitutional violation perpetrated by state actors, Lucas fails to allege a *Monell* claim against the LPSO sheriff.

### 1. *Under Color of State Law*

Section 1983's text "protects against acts attributable to a State, not those of a private person." *Lindke v. Freed*, 601 U.S. 187, 194 (2024). "'[S]tate action exists only when' the constitutional deprivation 'ha[s] its source in state authority.'" *See Hernandez v. Causey*, 124 F.4th 325, 336 (5th Cir. 2024) (quoting *Lindke,* 601 U.S. at 198). Simply put, Lucas's allegations that Landry's decadelong harassment campaign had its source in a purely personal/private vendetta against Lucas and that he was

repeatedly victimized by his neighbor in his neighborhood fail to implicate any manifestations of the under-color-of-state-law element. By failing to allege facts indicating that Landry acted under the color of state law, Lucas thereby fails to allege any § 1983 claim against the LPSO Defendants who allegedly stood by while Landry in *his personal and private capacity* harassed/assaulted Lucas.

The state action and under-color-of-state-law doctrines[94] track the general rule that constitutional rights generally restrict "state action" but not "private conduct." *Lindke*, 601 U.S. at 195 (generally observing that "ordinarily" § 1983 applies to actions of police officers but "absent some very unusual facts, no one would credit . . . a plaintiff's complaint [regarding his] neighbor"). Though the Supreme Court's state-action precedents largely "have grappled with variations of . . . whether a nominally private person has engaged in state action for purposes of 1983[,]" *Lindke* confronted "whether a state official engaged in state action or functioned as a private citizen." *Id.* at 195 (citations omitted).[95] The Court observed that "the state-action requirement exclude[s] from liability 'acts of officers in the ambit of their personal pursuits,' [thereby] 'protect[ing] a robust sphere of individual liberty for those who serve as public officials or employees[.]'" *Id.* at 196 (citations omitted). Ultimately, a Section 1983 plaintiff "cannot hang his hat on [the public official's] status as a state employee"

---

[94] "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 928-29 (1982) (citation omitted).

[95] In *Lindke v. Freed*, the Supreme Court addressed whether a state official engaged in state action or functioned as a private citizen. Freed, the city manager of Port Huron, Michigan, maintained a Facebook page, where he posted both personal updates and information relating to his government job. *Id.* at 191–93. After a constituent, Lindke, posted negative comments, Freed deleted the negative comments and blocked Lindke from commenting on Freed's Facebook page. *Id.* at 190–91, 193. Lindke sued, alleging Freed violated his First Amendment rights. *Id.* at 193.

because "[t]he distinction between private conduct and state action turns on substance, not labels[.]" *Id.* at 197.

      *Lindke* elucidates a framework for categorizing conduct. *See Mackey v. Rising*, 106 F.4th 552, 559 (6th Cir. 2024) (observing that "[s]tate employees do not work for the State every hour of the day[; t]hey also undertake all sorts of private activities on their own time" and further that *Lindke* "tailored [*Griffin v. Maryland*'s] general test to the specific social-media context"). First, there is a "bedrock requirement that 'the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State[,]' [*i.e.,*] traceable to the State's power or authority." *Lindke,* 601 U.S. at 198 (citations omitted). To be sure, determining the scope of an official's actual authority anchored in state law is a critical threshold issue: "the state-action doctrine requires that the State have granted an official the type of authority that he used to violate rights—*e.g.,* the power to arrest—it [thus] encompasses cases where his 'particular action'—*e.g.,* an arrest made with excessive force—violated state or federal law." *Id.* at 200 (citations omitted). Second, to qualify as state action, the plaintiff must allege or show that "the official is purporting to exercise state authority." *Id.* at 201-03 (illustrating by hypothetical that context matters in determining whether an official invoked his official authority, *e.g.,* where a school board president announces at a school board meeting that the board lifted pandemic restrictions on public schools, versus when one is merely engaged in private action in a "personal capacity as a friend and neighbor," *e.g.,* the next evening the same school

board president at a barbeque with friends shares that the board lifted the restrictions).

"[W]hen the challenged conduct 'entail[s] functions and obligations in no way dependent on state authority,' state action does not exist." *Id.* at 198–200 (citations omitted) ("[T]he '[m]isuse of power, possessed by virtue of state law,' constitutes state action"; but "[t]o misuse power, . . . one must possess it in the first place[.]"). Indeed, the Supreme Court's more recent pronouncement is simply a gloss on the well-established principles frequently applied by the Fifth Circuit. Informing whether a plaintiff has alleged facts sufficient to plead that an officer misused official power, the Fifth Circuit has elaborated on the scope of the essential color-of-state-law prerequisite to § 1983 liability:

> Under "color" of law means under "pretense" of law. Generally, if an officer is performing their official duties, their acts "are included whether they hew to the line of their official authority or overstep it," though "acts of officers in the ambit of their personal pursuits are plainly excluded." That said, even if an officer acts for purely personal reasons, he or she may still act under color of law if they are "acting by virtue of state authority."

*Gomez v. Galman*, 18 F.4th 769, 775-76 (5th Cir. 2021) (internal citations omitted) (observing that "whether a police officer is acting under color of law does not depend on duty status at the time of the alleged violation").

Assessing the under-color-of-law element thus compels consideration of "(1) whether the officer 'misuse[d] or abuse[d] his official power,' and (2) if 'there is a nexus between the victim, the improper conduct, and [the officer's] performance of official duties.'" *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 464 (5th Cir. 2010) (quoting

*Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir.2002) (emphasis added)). Thus, "[i]f an officer pursues personal objectives without using his official power as a means to achieve his private aim, he has not acted under color of state law." *Id.* (citing *Townsend*, 291 F.3d at 861).

Substance—context—is key, as illustrated by cases where courts find that the under-color-of-state-law prerequisite was satisfied. *See, e.g., Tyson v. Sabine*, 42 F.4th 508 (5th Cir. 2022) (finding support in the summary judgment record of a nexus between the alleged sexual assault misconduct and the deputy's abuse of official authority where deputy's alleged relationship with the victim grew out of legitimate police activity—the victim's husband's request for a welfare check on his wife; deputy then used the authority of his office to determine victim's address, whether she would be alone there, and whether there were security cameras; deputy relied on the pretense of the legitimate wellness check to entice Tyson to a more secluded part of her home; and deputy interwove sexual advances with his law enforcement authority); *Gomez*, 18 F.4th at 776 (the district court erred in finding that bar patron victim of police officer beating failed to allege that the plain-clothed off-duty officers did not act under color of state law, considering the following "add[ed] to the air of official authority that pervaded the assault": officers' tone of voice and direct orders to stop, use of a police hold in forcing the plaintiff's hands behind his back, calling for backup and identifying themselves to law enforcement dispatch as police officers); *United States v. Dillon*, 532 F.3d 379, 386 (5th Cir. 2008) (assistant city attorney acted under color of law when he sexually assaulted two women in his office,

44

reasoning that he took advantage of his position to become acquainted with the victims; he ensured the women were alone and secluded in his office; he indirectly referenced his power and made implicit threats that could have left victims with the impression he could have one victim's son re-arrested); *Bennett v. Pippin*, 74 F.3d 578, 589 (5th Cir. 1996) (holding that sheriff acted under color of law when he questioned suspect of criminal investigation on the porch of her home then returned later to sexually assault her); *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991) (finding requirement under color of state law met where off-duty deputy sheriff assaulted wife's alleged ex-lover in a private vendetta but identified self as police officer, used service weapon, and suggested that he could use police authority to get away with the paramour's murder).

With the above authorities indicating what suffices for one to act under color of state law, *Bustos* is instructive in illustrating what falls short. Bustos alleged that he was physically assaulted and battered by off-duty police officers who were out drinking at a night club with female companions. 599 F.3d at 465. The Fifth Circuit affirmed the district court's grant of the assaulting officers', bystanding officers', and City's motion to dismiss the plaintiff's Section 1983 claims, determining that Bustos failed to plead that the officers who assaulted him acted under color of state law. *Id.* at 465-66 and 469.[96] In so doing, the Fifth Circuit distinguished cases "concerning

---

[96] Notably, as discussed further below, Bustos's failure to allege that the assaulting officers acted under color of state law likewise doomed his failure to intervene theory predicating claims against other, bystanding officers. *Id.* at 466-67. Bustos failed to state a claim against bystander officers because he failed to allege that the bystander officers had a constitutional duty to prevent an alleged assault or harm by private individuals (who merely happened to be police officers). *Id.* And, finally, because Bustos alleged no constitutional injury attributable to police officers, Bustos failed to

45

police officers pursuing violent private aims" but yet where the under-color-of-law element nevertheless was satisfied because in each of those cases, "the officer [had] used his official power to facilitate his actions." *Id.* at 465.[97]

That Bustos failed to "allege facts to suggest that the officers who assaulted him misused or abused their official power" doomed his ability to state a plausible Section 1983 claim against the off-duty officers who allegedly assaulted him. 599 F.3d at 465. Bustos's factual allegations lacked the hallmarks of a Section 1983 claim where police officers are clothed with state authority. Absent from his complaint were any allegations that the officers were in uniform or that the officer that assaulted him used an official service weapon or threatened him by asserting his authority as a police officer. *Id.* Thus, "no 'air of authority' pervaded this barroom altercation." *Id.*

So too here. Lucas like Bustos fails to allege facts to suggest that Landry—the only perpetrator of harassment or assault—misused or abused his official power, much less that the "air of official authority . . . pervaded the assault" and harassment.

First, the Court considers whether the conduct allegedly causing the constitutional violation is fairly attributable to the State, *i.e.,* whether the State

---

state a *Monell* claim against the city because he did not allege that a municipal policy was the moving force behind a violation of his constitutional rights. *Id.* at 467 (additionally affirming dismissal of Bustos state law tort claims against the City due to Texas common law immunity).

[97] For example, the Fifth Circuit examined *Tarpley*, in which "[t]he presence of police and the air of official authority pervaded the entire incident" where a deputy sheriff—who lured his wife's former lover to his home and assaulted him—used his service weapon, identified himself as a police officer, summoned another officer who identified himself as a fellow officer, and the two ran the victim out of town in their squad car. The panel then examined *United States v. Causey*, 185 F.3d 407, 415-16 (5th Cir. 1999) in which the police officer defendant's status as a police officer "put him in the unique position" to offer protection to his co-conspirators and cover up the murder of an individual who had filed a complaint with internal affairs, and other evidence sufficed for a jury to conclude that the officer acted under color of state law, including that the defendant met with co-conspirators in the police station, drove them in his police car to areas the victim frequented, and had discussions with them during his shift.

granted Landry as a commissioned officer in Assumption Parish the type of authority he used to violate Lucas's rights. Lucas's allegations stumble on this threshold element: he alleges no facts indicating that the State conferred on Landry any authority to harass, assault, or show up at Lucas's house and menace or threaten him. Notably, Lucas does not allege that Landry purported to use any arrest, detention, or official search or interrogation powers in any of their interactions. Instead, the facts alleged underscore the personal quality of the neighbor-on-neighbor harassment. Lucas alleges no facts indicating that Landry's vendetta/pursuit was officially authorized or had its origin in Landry's duties as a reserve deputy. At best, the facts alleged indicate that Landy was acting *not* under the pretense of any official authority vested in him but, rather, as a father retaliating after (he was told, however falsely) a neighbor allegedly made an obscene hand gesture toward his daughter, or as a private contractor still bitter that his neighbor criticized his private contracting company's workmanship.

Second, the Court considers whether Lucas alleges that Landry purported to exercise his official authority—any nexus between the victim, the improper conduct, and the officer's performance of his official duties. Here, too, Lucas's allegations falter: there are no allegations that Landry purported to use official authority to facilitate his harassment or alleged assault of Landry. Again, the challenged conduct in November 2023—driving a few blocks to Lucas's house, jumping out of a running black GMS Sierra, crossing by foot onto Lucas's driveway, and "screaming death threats at Mr. Lucas and his wife"—are in no way alleged to be dependent on Landry's

authority as an Assumption Parish commissioned officer or reserve deputy. Lucas alleges no facts that would indicate that Landry was acting under the pretense of law. Lucas and Landry are acquainted with one another because they are neighbors living close by in the same subdivision, where Landry's private company allegedly installed a poor drainage system and Lucas thereafter publicly outed Landry as the system's builder. That is how and where their conflict originated and proliferated. Other than a domestic or familial dispute, it's hard to imagine a more personal pursuit than the one alleged by Lucas, replete with a grudge held from a perceived professional slight, road rage, car-keying, lewd hand gestures—a neighbor-on-neighbor feud culminating more than once with mutual protective orders involving spouses and children.

According to Lucas's allegations, Landry displayed none of the hallmarks of a law enforcement official. Lucas's affirmative pleading deficiencies are amplified by facts not pled: no allegations in the 66-page complaint suggest that Landry ever wore a police uniform;[98] flashed his badge; detained or purported to arrest Lucas; ordered Lucas to do anything under the pretense of his official authority; drove a marked vehicle[99] in perpetrating the traffic violations, disregarding traffic signs, and harassing drive-by incidents; used his service weapon; or "otherwise acted like [a] police officer or demonstrated an air of authority[.]" *Compare Larpenter v. Vera*, No. 22-30572, 2023 WL 5554679, at *2-3 (5th Cir. Aug. 29, 2023) (citations omitted,

---

[98] Landry's civilian dress—dark blue jeans, bright yellow shirt with company logo, tan dress shoes—is mentioned once. ECF No. 1 ¶ 70.
[99] Lucas alleges that Landry perpetrated his campaign of harassment while driving a black Porche Cayenne, a white truck, a white Chevy Tahoe, a black Chevrolet Silverado, a black GMC Sierra, and a four-wheeler.  ECF No. 1 ¶¶ 36, 39, 53, 59, 70, 86, 92.

cleaned up) (*sua sponte* addressing under-color-of-law element and determining that defendant, who—in his capacity as an off-duty private security guard—violently removed a Mardi Gras ball attendee from the event space, was acting under color of state law because defendant "displayed all the hallmarks of a law enforcement official" including that he was wearing his official uniform, gave "lawful" commands, and employed a maneuver learned in police training) *with Townsend v. Moya*, 291 F.3d 859, 860 (5th Cir. 2002) (holding that prison guard did not act under color of law when he stabbed inmate during game of horseplay unrelated to guard's official duties); *Delcambre v. Delcambre*, 635 F.2d 407, 408 (5th Cir. Unit A. Jan. 1981) (holding that on-duty chief of police did not act under color of law when he assaulted his sister-in-law at police station because assault arose from purely private family dispute and defendant did not threaten to arrest plaintiff).

Critically, Lucas sues Landry as a private individual—a civilian neighbor who owns his own contracting business—not as an officer or state actor.[100] Though Lucas mentions that Landry is "a reserve deputy" with Assumption Parish Sheriff's Office[101] and that Landry testified that he is a "commissioned officer,"[102] these are mere labels whereas the under-color-of-state-law element "turns on substance." *Lindke*, 601 U.S. at 197.[103] As for substance, Lucas alleges facts uniformly indicating a prevailing

---

[100] ECF No. 1 ¶¶ 10, 17A.

[101] *Id.* ¶¶ 15, 175

[102] *Id.* ¶ 159.

[103] In his opposition, Lucas argues that the LPSO Defendants knew that "Defendant Landry utilized his reserve credentials to contact three unnamed officers from Assumption Parish Sheriff's Office to be present" at Landry's house, after Landry was intercepted by the LPSO, after Landry showed up at Lucas's house on November 30. ECF No. 21 at 13. But the Court considers only the well-pleaded facts in the complaint; it cannot consider newly minted allegations made beyond the complaint. *Blankenship v. Buenger*, 653 F. App'x 330, 337 n.22 (5th Cir. 2016); *Dorsey v. Portfolio*

*personal* quality to the rivalry between Lucas and Landry. Ultimately, Landry's alleged conduct is mere private conduct excluded from Section 1983's reach. This dooms Lucas's attempt to impose Section 1983 liability on the LPSO Defendants.

It follows, as set forth below, that Lucas fails to state a bystander liability claim against the LPSO Defendants and any *Monell* claim against the sheriff.

### 2. *No Constitutional Violation Perpetrated by State Actor*

Lucas's Section 1983 claims against the LPSO Defendants fail as a matter of law because Lucas does not allege that any of the LPSO Defendants violated his constitutional rights. Instead, he purports to allege that Landy inflicted a constitutional injury while the LPSO Defendants failed to intervene. However, by failing to allege facts indicating that Landry acted under color of state law, Lucas's bystander liability theory fails to implicate any constitutional violation perpetrated by a state actor. Thus, Lucas fails to state a failure to intervene claim and, ultimately, fails to allege that any LPSO Defendant violated Lucas's constitutional rights— warranting dismissal of all Section 1983 claims against them.

In the LPSO Defendants' dismissal motion, they argue that Lucas fails to plead an underlying constitutional violation perpetrated by an officer acting under color of state law. In Count 3, Lucas claims that Defendants Stephen Waldrop, Zachary Sciortino, Elliot Day, and the LPSO "had a duty to intervene when Defendant Landry

---

*Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008). Even if the Court considered this argument as an allegation, it amounts to nothing more than another stray suggestion that Landry happens to be a law enforcement officer with reserve credentials. Lucas fails to suggest how this would support a finding that he alleged Landry acted under color of state law or inflicted a constitutional injury in allegedly harassing Lucas.

was violating Mr. Lucas' constitutional rights, which resulted in the infliction of excessive force/violations upon Mr. Lucas."[104] In Count 4, Lucas purports to allege a *Monell* claim against Sheriff Webre based on LPSO officers' violations of Lucas's Fourth Amendment rights in standing by while Landry allegedly utilized excessive force.[105]

Lucas fails to allege facts that plausibly suggest that the LPSO Defendants stood by while a state actor violated his constitutional right to be free from excessive force, much less to allege facts that would overcome the LPSO Defendants' assertion of qualified immunity. Considering that the mine-run bystander liability or failure to intervene cases in the Fifth Circuit concern circumstances in which the officers are literally standing by at the scene where constitutional excessive force violations are unfolding, Lucas's conclusory allegations that the LPSO Defendants were complicit in constitutional violations perpetrated against him by failing to intervene in Landry's harassment of Lucas do not fit the mold.

The Fourth Amendment guarantees the "right of the people to be secure . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. "[T]here is no 'generic right to be free from excessive force.'" *Kennedy v. City of Arlington*, 165 F.4th 937, 943 (5th Cir. 2026) (quoting *Graham v. Connor*, 490 U.S. 386, 393 (1989)). In plain terms, "[a]n excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances." *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017).

---

[104] ECF No. 1 ¶ 210.
[105] *Id.* ¶¶ 224-233.

Thus, "[t]o state a Fourth Amendment excessive-force claim, a plaintiff must show two things: (1) a seizure occurred; and (2) the force used was unreasonable." *Estate of Parker v. Mississippi Dept. of Public Safety*, 140 F.4th 226, 238 (5th Cir. 2025) (citation omitted). "[A] Fourth Amendment seizure occurs 'when there is a governmental termination of freedom of movement through means intentionally applied.'" *Id.*; *Ramirez v. Guadarrama*, 3 F.4th 129, 134 (5th Cir. 2021) (citation omitted) ("The Fourth Amendment protects individuals from being subjected to excessive force when they are physically apprehended or subdued by agents of the government.").[106] "An officer's use of force is unreasonable under the Fourth Amendment if the plaintiff shows: '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Estate of Parker,* 140 F.4th at 239.

"Both bystander liability and municipal liability require [the plaintiff] to plead an underlying constitutional violation." *Id.* at 245. And, "[m]ere allegations of verbal abuse do not present actional claims under § 1983." *See Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993); *see also McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir.

---

[106] *But see Tyson*, 42 F.4th at 515 (observing that all claims that officers used excessive force during an arrest, stop, or seizure should be analyzed under the Fourth Amendment but when "neither a search nor seizure took place, the claim falls outside the Fourth Amendment and comes instead within the substantive due process component of the Fourteenth Amendment"). Here, Lucas alleges mere labels and conclusions invoking "the Fourth Amendment" and "excessive force" at Landry's hands. Because he fails to allege facts supporting this or any other ostensible theory for any alleged constitutional injury, it is unclear whether Lucas alleges that Landry purported to effect a seizure when he showed up on Lucas's driveway in November 2023 (before law enforcement intervened and briefly handcuffed Landry). But because Lucas likewise fails to allege any facts supporting excessive force or any constitutional injury effected by a state actor, the Court declines to grapple with under which theory Lucas purports to proceed.

1983) ("[A]s a general rule, 'mere threatening language and gestures . . . do not, even if true, amount to a constitutional violation."), *cert. denied*, 464 U.S. 998 (1983).

Notably, after the panel in *Bustos* determined that the plaintiff failed to allege that the assaulting officers acted under color of state law, *Bustos* also affirmed dismissal of Section 1983 claims against bystander officers and dismissal of the *Monell* claim for failure to allege that any officer had violated plaintiff's constitutional rights. The same result obtains here.

Because the Fourth Amendment binds only the government, Lucas's Section 1983 claims against the LPSO Defendants based on Landry's purported unconstitutional conduct is a nonstarter because Landry allegedly harassed Lucas in Landry's capacity as a private citizen. Absent from the complaint are any factual allegations suggesting that Landry acted under color of state law, effected a seizure of Lucas, or utilized force in the process, much less that any force used was unreasonably excessive and that the LPSO Defendants failed to intervene. Further illustrating Lucas's failure to allege facts plausibly indicating that the LPSO Defendants could be liable to Lucas under a theory that they failed to intervene in Landry's perpetration of excessive force against Lucas, the elements of the bystander liability cause of action are framed in terms of police officer liability at the scene of another *fellow officer* violating an individual's constitutional rights:

> A failure to intervene claim against a police officer requires that the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) is present at the scene of the constitutional violation; (3) has a reasonable opportunity to prevent the harm; and (4) chooses not to act.

*Armstrong v. Asheley*, 60 F.4th 262, 280 (5th Cir. 2023) (citing *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013)); *see also Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 342 (5th Cir. 2020) ("Bystander liability requires more than mere presence in the vicinity of the violation; 'we also consider whether an officer acquiesced in the alleged constitutional violation.'"); *Norman v. Ingle*, 151 F.4th 707, 713-14 (5th Cir. 2025) (where police officer "did not actively participate in the challenged conduct" and plaintiff offered no analogous case law that a reasonable officer would know of his duty to intervene in the circumstances presented, plaintiff failed to meet his burden of demonstrating that his claim was not barred by qualified immunity).

Lucas fails to allege facts which support these elements. The LPSO Defendants contend that, as pled, Lucas has not and cannot state a bystander liability claim against Day, Sciortino, or Waldrop. That is because, according to the LSPO Defendants, the facts do not support Lucas's contention that Landry used "excessive force," much less committed some other constitutional violation, when certain LPSO Defendants indeed were present during the November 30, 2023 incident as Landry sped down the street in his truck; when Landry was placed in handcuffs; and when Landry orally threatened Lucas but did not physically touch or brandish a gun toward Lucas. In other words, according to the LSPO Defendants, Lucas fails to make out a Fourth Amendment violation and any bystander liability theory. The Court agrees.

Lucas fails to allege factual material plausibly indicating that Landry was acting under color of law in effecting a violent seizure of Lucas, much less any factual allegations implicating the LPSO Defendants as bystanders present at the scene

choosing not to act while another officer acting under color of state law violated Lucas's Fourth Amendment rights. Absent allegations that Landry acted under color of state law, that a state officer acting under color of state law used excessive force in violation of the Fourth Amendment, and that the LPSO Defendants failed to intervene in the use of excessive force, Lucas's factual allegations do not fit this Section 1983 theory of derivative liability whatsoever. *See Kennedy*, 165 F.4th at 946. His Section 1983 failure to intervene claims against the LPSO Defendants must be dismissed.

Because Lucas fails to allege that he suffered a constitutional injury at the hands of the LPSO Defendants, Lucas's other derivative claim based on *Monell* is likewise doomed. *See id.* at 946-47*; see also Bustos*, 599 F.3d at 467 ("Because Bustos has alleged no constitutional injury attributable to the Officers, Bustos has failed to state a claim that a City policy was the moving force behind a violation of his constitutional rights.").

Accordingly, as pled, any Section 1983 claims against the LPSO Defendants— including a *Monell* claim against the sheriff—fail as a matter of law.

### C.    State Law Claims and Immunity

Finally, Lucas purports to sue "all defendants" for "assisting" Landry in abusing Lucas's rights (Count 7) and inflicting emotional distress upon Lucas (Count 8). The LPSO Defendants move to dismiss both claims for failure to state a claim and because Louisiana confers immunity on them where it is alleged that the LPSO Defendants have merely exercised discretion in the course and scope of their law

enforcement duties. The Court agrees that dismissal of Lucas's state law claims is warranted.

As a threshold matter, it is unclear whether Louisiana recognizes a cause of action for "assisted" abuse of rights or "assisted" infliction of emotional distress. Lucas does not purport to allege that the LPSO Defendants themselves abused Lucas's rights or inflicted emotional distress upon him. Nor does Lucas allege that the LPSO Defendants conspired with Landry to abuse Lucas's rights or inflict emotional distress upon him. No factual allegations are advanced that would plausibly support that the LPSO Defendants acted pursuant to an agreement with Landry to harass Lucas. Accordingly, insofar as Lucas purports to allege an assisted or attempted abuse of rights or assisted or attempted infliction of emotional distress, any such claim fails as a matter of law. Lucas likewise fails to allege facts that would overcome discretionary immunity, or any facts that would plausibly indicate that the LPSO Defendants are liable to Lucas for abuse of rights or intentional (or negligent) infliction of emotional distress.

### 1. *La.R.S. 9:2793.11 Officer Immunity for Discretionary Functions*

"A civil claim for damages against a peace officer or public entity that employs or appoints a peace officer shall be prohibited [where] (1) The conduct or actions of the peace officer arise out of the performance of any discretionary function within the course and scope of the peace officer's law enforcement duties." La.R.S. § 9:2793.11(B)(1). "[C]riminal, fraudulent, or intentional misconduct," however, is

excepted from this general rule such that peace officers are ineligible for immunity if engaged in the same. *Id.* (C)(1).

Viewing the alleged facts in the light most favorable to Lucas, he alleges no facts indicating criminal, fraudulent, or intentional misconduct on the part of the LPSO Defendants. Though he labels his infliction of emotional distress claim as sounding in "intentional" conduct, Lucas retreats from this label in his briefing, suggesting "[a] claim for negligent infliction of emotional distress without physical injury is viable under La. Civ. Code art. 2315(A)[.]"[107] In any event, the Court does not take as true mere labels or conclusions, only well-pled facts. At best, Lucas alleges that the LPSO Defendants acted negligently in failing to investigate, undertaking inadequate investigations of Landry's allegedly intentional conduct, or in careless record keeping or inadequate follow-up. Assuming such conduct is legally actionable under any state-law theory, because the only facts alleged by Lucas concerning LPSO conduct concern those officers and the sheriff performing discretionary functions within the course and scope of their law enforcement duties, La.R.S. § 9:279311 bars his state law claims against them. For this reason alone, Lucas's abuse of right and intentional or negligent infliction of emotional distress claims must be dismissed as to the LPSO Defendants.[108]

---

[107] ECF No. 21 at 23.

[108] The alleged facts giving rise to this lawsuit predate the effective date of the statute, April 29, 2024. Lucas resists the statute's application not on grounds of La.R.S. § 9:2793's non-retroactivity, but, rather, by arguing that he alleges that *Landry* committed intentional misconduct which should (somehow) defeat the statute's application to the LPSO Defendants who he alleges "assisted" Landry. Any later assertion by Lucas that the statute does not apply retroactively is likely forfeited. *See Matter of Green*, 968 F.3d 516, 522 (5th Cir. 2020) (citing *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.")). Regardless,

### 2. *Abuse of Right*

Lucas fails to state an abuse of right claim against the LPSO Defendants. "[I]nvoked sparingly[, t]he abuse of rights doctrine is a civilian concept which is applied only in limited circumstances because its application renders unenforceable one's otherwise judicially protected rights." *Steier v. Heller*, 31,733 (La. App. 2 Cir. 5/5/99), 732 So.2d 787, 790 (citations omitted). The doctrine applies only if the plaintiff alleges that one of the following conditions is met:

> (1) the predominant motive for exercise of the right is to cause harm;
> (2) there is no serious or legitimate motive for exercise of the right;
> (3) the exercise of the right violates moral rules, good faith, or elementary fairness; or
> (4) the exercise of the right is for a purpose other than that for which it was granted.

*Id.* at 791.

Merely articulating these conditions illustrates how this cause of action is a poor fit for Lucas's allegations against the LPSO Defendants. Indeed, the doctrine seems to apply in circumstances such as in the exercise of a contractual right. *See id.*; *see also Sartisky v. Louisiana Endowment for the Humanities,* No. 14-1125, 2014 WL 5040817, at *3-4 (E.D. La. Sept. 26, 2014) (Engelhardt, J.). Here, Lucas's alleged facts villainize Landry—not the LPSO Defendants. Lucas alleges no facts regarding any of the LPSO Defendants that would satisfy any of these conditions. Lucas does not allege that any LPSO Defendant was motivated to cause harm, much less that any LPSO Defendant exercised any "right" that violated good faith, lacked a legitimate

---

the Court considers the LPSO Defendants' alternative grounds for dismissal of Lucas's state law claims and finds that each independently has merit and warrants dismissal of Lucas's state law claims.

motive, or was "for a purpose other than that for which it was granted." Again, at best, Lucas alleges that the LPSO Defendants failed to adequately investigate Lucas's complaints against Landry and he otherwise concludes that they "assisted" Landry in abusing his rights. Lucas fails to state an abuse of right claim against the LPSO Defendants.

### 3.  *Intentional Infliction of Emotional Distress*

To state a claim for intentional infliction of emotional distress, the plaintiff must allege facts indicating that "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto*, 585 So.2d 1205, 1209 (La.1991). To satisfy the first element, the challenged conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not satisfy the first element, considering that "[p]ersons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Id.* The conduct must be calculated to cause severe emotional distress, not merely fright, humiliation, or embarrassment. *Id.* at 1210.

The LPSO Defendants contend that Lucas has failed to allege facts meeting this high threshold because he alleges no facts indicating that any of them acted in an outrageous manner or desired to inflict severe distress upon him. The Court agrees. In his complaint, Lucas focuses on Landry's alleged conduct which he characterizes as extreme and outrageous, but he alleges that all defendants collectively "named and unnamed" "knowingly and willingly assisted Defendant Landry."[109] Lucas's allegations that the LPSO Defendants performed inadequate investigations or that their reports of various incidents left something to be desired— or otherwise fell short in the performance of their discretionary functions—fall well short of outrageous or "intolerable in a civilized community." In his opposition papers, Lucas appears to concede that it is Landry whom he alleges had the desire to inflict emotional distress and that the other defendants collectively "should have known" that Landry's conduct caused him stress.[110] Lucas's allegations fall well short of the high threshold on conduct sufficient to state an emotional distress claim. Lucas has failed to state a claim for intentional infliction of emotional distress against the LPSO Defendants.

### D.    Amendment Would be Futile.

In the concluding paragraph of his opposition, Lucas requests the opportunity to amend his complaint if the Court "disagrees" that he has sufficiently pled any cause

---

[109] ECF No. 1 ¶¶ 259-62.

[110] ECF No. 21 at 24 ("Defendants had knowledge that Plaintiff was a Veteran, further Defendants all witnesses (sic) to the immense effects of the emotional distress that cumulated since 2016 [and] Defendants should have known that his was likely to cause severe emotional distress, which was compounded by his mental health history and the circumstances of having (sic) of 2016 and 2020.").

of action. But a plaintiff's "bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1170 (5th Cir. 2022) (quotation omitted); *cf. Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 491 (5th Cir. 2024) (affirming denial of "bare bones" request in motion-to-dismiss opposition for "an opportunity to amend the [c]omplaint if the Court deems additional factual allegations are necessary" because such a request "remains futile when it fails to apprise the district court of the facts that the plaintiff would plead in an amended complaint" (cleaned up)).

Lucas offers no indication that or how he could plead facts sufficient to allege a plausible claim against the LPSO Defendants. The crux of his claims against the LPSO Defendants is that they failed to investigate or charge Landry, but he has no Article III standing to pursue such claims. Lucas's allegations sounding in a failure to investigate is a standing problem, not a pleading problem that could be remedied by amendment. *See Lefebure v. Boeker*, No. 17-1791, 2023 WL 3069125, at *2-3 (M.D. La. Mar. 31, 2023) (Jackson, J.) (citing *Lefebure*, 15 F.4th at 662). Moreover, Lucas concedes that most of his factual allegations occurred so long ago that any cause of action based upon those would be time-barred. Furthermore, Lucas fails to allege facts indicating that Landry acted under color of state law (and, all well-pled facts plausibly indicate the contrary: that Landry pursued a wholly personal vendetta against his neighbor, Lucas). This dooms his Section 1983 claims against the LPSO

Defendants which are predicated on derivative theories of bystander liability and *Monell*. Because he alleges no standalone constitutional violation by the LPSO Defendants, his derivative claims are fatally defective. Lucas fails to suggest how he might remedy the fundamental defects in his Section 1983 claims against the LPSO Defendants. Nor has he alleged any facts that would overcome these defendants' immunity for his state law claims, much less how he could allege facts that support the elements of those claims. Given Lucas's failure to offer any indication that he could revamp his 66-page complaint to plead facts sufficient to address the fundamental defects in his claims against the LPSO Defendants, the Court finds that leave to amend would be futile.

## IV.  CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS ORDERED** that the motion[111] to dismiss by the LPSO Defendants is **GRANTED**.

New Orleans, Louisiana, this 2nd day of March, 2026.

_____
BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[111] ECF No. 20.